IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MEOISHA K. WILLIAMS,
   Plaintiff,

vs.            Case No. 5:11cv327/MMP/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
   Defendant.
_____/

## REPORT AND RECOMMENDATION

   This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

   Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded for further proceedings.

I.  PROCEDURAL HISTORY

   On April 29, 2009, Plaintiff filed applications for DIB and SSI, and in both applications she alleged disability beginning September 18, 2008 (tr. 18).[1]  The applications were denied initially and

---

[1]  All references to "Tr." refer to the transcript of Social Security Administration record filed on January 30, 2012 (doc. 8).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other numbers that may appear.

on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on December 16, 2010, and on January 25, 2011, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 18–25).  On September 3, 2011, the Appeals Council denied Plaintiff's request for review (tr. 1).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.     FINDINGS OF THE ALJ

        On January 25, 2011, the ALJ found in relevant part as follows (tr. 18–25):

    1)      Plaintiff meets the insured status requirements of the Act through December 31, 2012.[2]

    2)      Plaintiff has not engaged in substantial gainful activity since September 18, 2008.

    3)      Plaintiff has the following severe impairments:  right hip degenerative joint disease ("DJD"), status post right wrist fracture and external fixation, and obesity.

    4)      Plaintiff has no impairment or combination of impairments that meets or medically equals a listed impairment.

    5)      Plaintiff has the residual functional capacity ("RFC") to perform light work, with some exceptions, as follows: she can lift and/or carry twenty pounds occasionally and ten pounds frequently; she requires a sit/stand option with an opportunity to change positions at least once every 30 minutes; she can occasionally climb, balance, stoop, and crouch but never kneel or crawl; she can tolerate occasional exposure to workplace hazards but no exposure to unprotected heights; she needs a cane for balance in her non-dominant (left) hand; and she is limited to performing no greater than the low end of semiskilled work.

    6)      Plaintiff can perform her past relevant work as a Teacher Aid II, a job she performed at the light level of exertion, because that job does not require the performance of work-related activities precluded by her RFC; she has therefore not been under a disability, as defined in the Act, from September 28, 2008, through January 25, 2011.

---

[2]  Thus, the time frame most relevant to this appeal is September 18, 2008 (date of alleged onset) to January 25, 2011 (date of ALJ's opinion), even though Plaintiff was last insured for DIB purposes through December 2012.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, hereinafter, citations in this Report should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal and Employment History

Plaintiff was born on March 29, 1984, and thus was twenty-four years of age on the date she alleges she became disabled (tr. 29).  She has a high school diploma, or equivalent thereto, and certification from the State of Florida in early child services (*see* tr. 31, 38–39, 50–51, 212).  She has past relevant work as a childcare attendant and teacher at a daycare center (i.e., a "Teacher Aide II") (tr. 32, 56).  She left her last daycare job in mid-July 2008 and then worked from mid-July through mid-September 2008 as a motel housekeeper.  Plaintiff was in a motor vehicle accident ("MVA") on September 19, 2008, and quit her job as a housekeeper at that time due to pain and a physical inability to perform job duties (*see* tr. 32, 36, 152, 153).

At the time of her hearing before the ALJ, in December 2010, Plaintiff was 5'5" tall and weighed 288 pounds (tr. 29–30).  She testified she had been on a diet and lost forty pounds (tr. 30).  Plaintiff also noted she is single, lives with her grandmother, has an unrestricted driver's license, and drives occasionally (tr. 30).[4]  She stated she cannot work due to pain in her right hip, noted she takes Advil for pain, and stated that the Advil makes her pain "better" (tr. 37, 39, 159).[5]  She also reported pain and problems with her (dominant) right arm and hand, such as difficulty opening doors or jars, and explained she had broken her right arm and undergone surgical repair (tr. 44–46, 55; *see also* 249, 253 (medical records reflecting that Plaintiff actually fractured her right wrist in the MVA)).  Plaintiff estimated she can sit one hour before needing to stand; stand one hour, with the use of a cane, before needing to sit; walk slowly fifteen to thirty minutes before needing to sit; and lift or carry ten pounds (tr. 40, 47).  She further opined she can sit, stand or walk for a combined total of five hours in an eight-hour workday (tr. 49).  Plaintiff testified that she performs no yard work and

---

[4]  Plaintiff indicated on a pain questionnaire dated May 21, 2009, that she does not drive and stated her "aunt drives [her] around" (tr. 160).  She further reported that she performs no housework, shopping or cooking (*id.*).  On the same date Plaintiff's grandmother reported nearly identical information, including that Plaintiff does no housework, shopping, or driving due to pain and related limitations (*see* tr. 162–64).

[5]  Plaintiff noted on a pain questionnaire dated May 21, 2009, that she takes naproxen and Vicodin to relieve pain (tr. 159).  Additionally, on disability reports dated July 16, 2009 and October 25, 2009, Plaintiff stated she takes Lortab and naproxen for pain (tr. 177, 188).

no housework whatsoever and that her only recreational activity is attending church (tr. 41–42).[6]
Finally, Plaintiff testified that she basically stays indoors all day and watches television, for
approximately fourteen to sixteen hours (tr. 42).

B.     Summary of Relevant Medical Records

Records dated before September 18, 2008 (Plaintiff's alleged disability onset date)

In mid-August 1995, at age eleven, Plaintiff underwent a pinning of the right hip for slipped
capital femoral epiphysis at Shands Hospital ("Shands") (tr. 229, 231).  A note from the anesthesia
department reflects that Plaintiff was healthy but "obese" at the time of her surgery (tr. 233).

On July 26, 2000, Plaintiff presented to orthopedist Mark M. Williams, M.D., with
complaints of sharp pain in the right hip (tr. 241).  It appears that Dr. Williams prescribed Vioxx,
an anti-inflammatory medication (*see* tr. 239).  Plaintiff returned to Dr. Williams on August 30, 2000
(*id.*).  She reported that her right hip symptoms, such as tenderness, were present but had improved
with Vioxx (*id.*).  Dr. Williams described Plaintiff as "a young lady in no acute distress" who
ambulated without difficulty and displayed "improved near normal gait . . . with minimal antalgic
component" (*id.*).  He noted, however, that range of motion in the hip was diminished and that the
hip remained stiff (and unchanged in this regard since Plaintiff's previous visit) (*id.*).  X-rays
revealed evidence of the 1995 surgery (notably, a screw in the hip) and of femoral head irregularity
with some sclerosis of the superior margin of the acetabulum with mild joint space narrowing but
no avascular necrosis (tr. 240).  Following his review of the x-ray results, Dr. Williams assessed
"right hip early degenerative arthritis with history of slipped capital femoral epiphysis surgery" and
right hip bursitis, he renewed the Vioxx, and he advised Plaintiff to return on an "as needed" basis
(tr. 239–40).  He also suggested that Plaintiff discuss a weight-loss program with her primary care
physician (*see* tr. 239).

---

[6] On June 25, 2009, Plaintiff advised Mark J. Smith, an employee with the Disability Determination Services
("DDS"), that she is able to dress, bathe, make a simple meal, occasionally shop, and occasionally dine out at a restaurant
(tr. 174).  On September 29, 2009, Plaintiff advised another DDS employee that she can dress and bathe herself, go to
doctor appointments, and "sometimes" go shopping, but she stated she "does not do any [activities of daily living]" (tr.
184).  And on October 25, 2009, Plaintiff stated she cannot drive or ride in a car, bathe, clean house or cook and that
she must rely on her grandmother to assist her with "bathing, dressing . . . cooking or cleaning the house" (tr. 189).

Records dated after September 18, 2008

On September 19, 2008, Plaintiff was involved in a MVA and shortly thereafter admitted to the Bay Medical Center with an isolated injury to the right wrist (i.e., a "closed, comminuted fracture of the distal radius") (tr. 253). Plaintiff, who was described as "obese" or "markedly obese," underwent a closed reduction surgery and application of an external fixator on the right upper extremity (tr. 249, 253). Plaintiff was discharged within approximately twenty-four hours (tr. 247, 253). She was instructed to use a sling, ice, and elevation for comfort; provided with Lortab 10 mg for pain; and advised to follow up with a physician at Bay Orthopedics (*see* tr. 247, 271–72, 275).

On September 22, 2008, Plaintiff presented to Bay Orthopedics for treatment for her wrist, and she was seen by Martin Gagliardi, M.D., F.A.C.S. (tr. 275). Dr. Gagliardi obtained x-rays and noted they revealed satisfactory alignment of the wrist fracture (tr. 267). He restricted Plaintiff to light duty work for two months and stated she should avoid lifting, pushing, or pulling with her right hand (tr. 275, 267). Plaintiff returned nine days later, and following an examination of the wrist Dr. Gagliardi stated that the "clinical appearance look[ed] good," neurovascular status was intact, pin tracks "look[ed] good," and the external fixator was "functioning nicely" (tr. 266). Plaintiff's Lortab prescription was renewed (but decreased to 7.5 mg), and she was advised to return in three weeks and refrain from housekeeping duties for two months (tr. 261, 266, 274). On October 29, 2008, the prescription for Lortab 7.5 was again renewed (tr. 262). Plaintiff next appeared for treatment on November 12, 2008, at which time Dr. Gagliardi released her to drive and work but advised Plaintiff that she should not lift more than five pounds with her right hand or arm (tr. 273; *but see* tr. 264 (a separate treatment note from Dr. Gagliardi, also dated November 12, 2008, which restricts lifting with the right extremity to ten pounds or less)). On November 19, 2008, Plaintiff's Lortab 7.5 was again renewed, with no refills (tr. 260). Plaintiff returned to Dr. Gagliardi on December 10, 2008, at which time he noted minimal swelling in the wrist with some weakness in grip strength, although range of motion was full in the small joints of the fingers and hand (tr. 280). He also noted "about 30 degrees of palmar flexion but only about 10 degrees of dorsiflexion" (*id.*). X-rays revealed good alignment and good healing (*see id.*). Plaintiff was instructed on "aggressive range of motion

exercises" and advised to completely discontinue use of the external support and return for treatment "as needed" (*id.*).

On or about May 12, 2009, Plaintiff presented to "Sickbay," an urgent care center, and was evaluated for complaints of right hip pain and foot swelling by Joseph Sbarra, M.D. (*see* tr. 308–09). Dr. Sbarra obtained x-rays of the right hip, which revealed the pin from Plaintiff's prior surgery, as well as femoral head deformity with degenerative changes but no evidence of recent fractures, dislocations, loosening of the hardware, or infection (*see* tr. 309, 333). He assessed arthritic changes in the right hip status post pin placement (tr. 333). Dr. Sbarra subsequently issued two letters, one to the DDS dated May 29, 2009, and one to vocational rehabilitation dated April 27, 2010, which are identical in all material respects (*compare* tr. 308 *with* tr. 333). The letters reflect that Plaintiff presented to Sickbay with complaints of right hip pain and foot swelling, with worsening pain over the past six weeks ranging in severity from eight out of ten ("8/10") to 10/10 on a ten-point scale, but the letters do not indicate the date on which Plaintiff presented (*see* tr. 308, 333).[7] The letters further indicate that Plaintiff was taking Ultram, Tylenol, Naprosyn, and Vicodin, and that she weighed 308 pounds (*see id.*). Dr. Sbarra stated Plaintiff's gait was abnormal, as she favored the left hip and had a probable leg length discrepancy (*id.*). He also stated she was tender with direct pressure to the right hip joint and had limited internal rotation and abduction of the right hip (*id.*). Dr. Sbarra included in the letters a description of the x-ray results (again, presumably from May 2009), as well as his assessment of arthritic changes in the right hip status post pin placement (*id.*).

On May 6, 2010, Plaintiff returned to Dr. Williams, and he performed a physical evaluation for vocational rehabilitation (tr. 334). Dr. Williams noted Plaintiff's surgical history and prior treatment with him and stated he had not seen Plaintiff since he initially treated her (*id.*). He also stated that Plaintiff had "done fairly well subsequently though she has never been completely normal with that hip" (*id.*). Plaintiff reported pain, stiffness, swelling, and limping and stated her symptoms had recently worsened, "especially since the last 3 years or so" (*id.*). She described her pain as sharp and stabbing, of 10/10 severity, constant but aggravated with weight-bearing activity, and localized

---

[7] Because there is only one treatment record in the file from Dr. Sbarra, dated May 12, 2009, the identical letters—the first of which is dated May 29, 2009—presumably concern Plaintiff's visit on May 12, 2009.

in the hip and groin area with radiation to the knee (*id.*). She also reported some numbness and tingling in the thigh and hip area of her leg. Finally, Plaintiff reported pain at rest and pain that woke her up at night (*id.*). Dr. Williams noted that Plaintiff weighed 289 pounds (*id.*). Upon examination, he observed that Plaintiff was well developed, well nourished, and in no acute distress (*id.*). She ambulated without an assistive device and stood in alignment, but she displayed an abnormal gait on the right side (tr. 334–35). Range of motion in the right hip was "very limited" with flexion and extension and caused pain "at terminal motion throughout" (tr. 335). X-rays revealed a significant abnormality consistent with her surgical history (*id.*). They also revealed as follows: "The femoral head has completely lost its normal round appearance and the neck area i[s] also basically obliterated and there is one large bone structure to encompass the head, neck and greater tuberosity . . . . Superior joint space is significantly narrowed to 2mm. Spurring and sclerosis is present on both sides of the joint." (*id.*). Following his review of these x-rays, Dr. Williams assessed right hip history of slipped capital femoral epiphysis requiring pin fixation in 1995, right hip DJD related to the initial slip, and right lower extremity altered gait secondary to same (*id.*). He opined that Plaintiff's condition appeared "to be an end stage problem" relating to the 1995 slipped joint, combined with an obesity problem (*id.*). He noted Plaintiff's report that she was informed by Shands that she would need to lose 100 pounds before another surgical procedure would be considered (*id.*). Dr. Williams recommended weight loss, not only for Plaintiff's hip condition but also for her long term health, and he stated she would need further surgery, most likely a total hip replacement (*id.*). Dr. Williams further noted that Plaintiff was "awfully young" to consider a total hip replacement but in any event he did not perform such surgeries (*id.*). Dr. Williams recommended use of a cane in the left hand to "help unload the weight across her hip joint" by about 50%, which he thought would help ease her symptoms "at least temporarily" (*id.*). Finally, Dr. Williams appeared to concur with the idea that Plaintiff would need to lose weight before undergoing hip replacement surgery in order to avoid a "premature failure" (*id.*).

     C.     Other Information Within Plaintiff's Claim File

     On September 29, 2009, Clarence Louis, M.D., a non-examining agency physician, completed a physical RFC assessment form, on which he opined that Plaintiff could perform light

exertional activity with occasional postural limitations (*see* tr. 324–31).  Dr. Louis noted that the severity of Plaintiff's alleged symptoms and purported impact upon her ability to function are "not entirely consistent with the total medical and non-medical evidence" (tr. 329).  Similarly, Dr. Louis noted that Plaintiff's allegations and reported symptoms appear "disproportionate to the expected severity and duration" of her medically determinable impairments (*id.*).

V.      DISCUSSION

Plaintiff raises two issues in this appeal.  She asserts the ALJ erred in evaluating her subjective complaints of pain and other symptoms and in determining her RFC (*see* doc. 10 at 8–14).  The Commissioner contends the ALJ evaluated Plaintiff's credibility and considered her claims for DIB and SSI in accordance with applicable statutes and regulations, and further, that the Commissioner's final decision is supported by substantial evidence on the record as a whole and should be affirmed (*see* doc. 13).

A.      ALJ's Credibility Determination and Related Findings

As this court is well aware, pain and other subjective complaints are treated by the Regulations as symptoms of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  The Eleventh Circuit first articulated a three-part pain standard in Hand v. Heckler, 761 F.2d 1545, 1548 (11th Cir. 1986), which has been more recently restated as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  *See also* Ogranaja v. Commissioner of Social Security, 186 F. App'x 848, 851 (11th Cir. 2006) (same) (quoting Wilson, 284 F.3d at 1225); Elam, 921 F.2d at 1213–16 (same; also characterizing the current pain standard as the "Hand standard").

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints.  Those complaints are, after all, subjective.  "[T]he ascertainment of the

existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. Unit A Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[8] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. Moreover, "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptom]. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." Hand, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine whether the quantum of pain or other symptom a claimant alleges is credible when considered in the light of other evidence. Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984). The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Here, in assessing Plaintiff's credibility the ALJ first noted the correct pain standard (tr. 22 (referencing 20 C.F.R. § 404.1529[9])). The ALJ then summarized Plaintiff's testimony and the relevant medical evidence (tr. 22–23). Thereafter, he concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the RFC, as detailed *supra*]" (tr. 23). In support of his credibility finding, the ALJ articulated the following reasons: (1) Plaintiff "partakes in a wide array of activities of daily living"; (2) Plaintiff "takes no prescription medication, only over-the-counter" ("OTC") Advil; (3) Plaintiff "is losing weight and the record reveals she can do

[8] Decisions of the United States Court of Appeals for the Fifth Circuit decided on or before September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[9] The Eleventh Circuit has approved of an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." Wilson, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

most things"; (4) Plaintiff "receives benefits from vocational rehabilitation ["VR"]," and she "testified that she intends to attend community college then start a business," but "[s]uch plans are not typically the type expected from a person who is totally disabled"; (5) although Plaintiff underwent right wrist surgery (a) "the record does not indicate much, if any, functional limitation [in the right upper extremity] and neither does she," (b) "[o]nly temporary restrictions were issued for the weeks following [the wrist] surgery then she was released to return to work at the daycare center, and (c) Plaintiff "made no right upper extremity complaints at her recent medical evaluation and is not seeing a doctor for her right wrist"; and (6) no acceptable treating, examining, or non-examining medical source has stated that Plaintiff is unable to work (*id.*).

Plaintiff contends that several of ALJ's reasons are not supported by substantial evidence on the record as a whole, and she contends the ALJ failed to properly assess her complaints of disabling pain and limitations due to her hip condition (doc. 10 at 12–13). The undersigned will first consider whether the ALJ's reasons are supported by the record and then discuss Plaintiff's related contention as to her complaints of hip pain, as well as her second ground for relief which is intertwined with the instant claim.

<u>Daily Activities</u>. The ALJ specifically found that Plaintiff "partakes in a wide array of activities of daily living" and "can do most things" (tr. 23). In support, the ALJ noted Plaintiff's testimony that she can lift and carry ten pounds, walk fifteen minutes, watch television all day, and drive occasionally[10] (tr. 21–22). This testimony, however, does not support a finding that Plaintiff engages in a wide array of daily activities and is able to "do most things." The Commissioner urges this court to consider, in addition to the testimony referenced by the ALJ, "Plaintiff's ability to shop, eat at restaurants, and take care of herself" (doc. 13 at 7, Commissioner's brief referencing tr. 174 (Plaintiff's report to a DDS worker), tr. 184 (Plaintiff's report to another DDS worker), and tr. 329 (Dr. Louis's reference to the foregoing DDS records)). But the activities identified here by the Commissioner were not identified by the ALJ in his decision. It is therefore unclear whether the ALJ

---

[10] The ALJ actually stated only that Plaintiff "has a driver's license," but he appears to have considered Plaintiff's ability to drive (*see* tr. 21–22; *see also* tr. 30 (in response to the ALJ's questions, Plaintiff specifically testified that has a driver's license and drives "sometimes" but not "all the time")).

considered this evidence in finding that Plaintiff is able to engage in a wide array of daily activities. *See, e.g.*, Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) (the district court may not create post-hoc rationalizations to explain the ALJ's treatment of evidence when that treatment is not apparent from the ALJ's decision itself); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991) ("It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence . . . "); Zblewski v. Schweiker, 732 F.2d 75, 78–79 (7th Cir. 1984) (while strong grounds may have existed for rejecting claimant's testimony, ALJ's failure to articulate reasons for doing so precludes meaningful appellate review). Furthermore, there are conflicts in the record regarding the nature and extent of Plaintiff's daily activities, and the ALJ failed to address the conflicts. For example, as previously noted, Plaintiff advised DDS employees that she can dress, bathe, make simple meals, and occasionally shop or dine out, but the ALJ failed to address Plaintiff's testimony—or the written reports by Plaintiff and her grandmother—that she cannot perform such activities (*see* tr. 159–64). While the conflicting reports undermine Plaintiff's credibility, the ALJ did identify the conflicts as a basis for discrediting Plaintiff. Indeed, the ALJ failed mention the conflicts altogether (or the opinions of Plaintiff's grandmother). On this record, the undersigned cannot conclude that the ALJ's first reason for discrediting Plaintiff's complaints is substantially supported by the record.

Plaintiff's Use of OTC Medication. The record supports the ALJ's finding that Plaintiff used only OTC medication for pain. Although Plaintiff contends there is evidence that she used stronger medications (*see* doc. 10 at 13), this evidence is scant and largely based on statements made by Plaintiff for which there are no corresponding medical records or other documentation, such as prescriptions or pharmacy records. To illustrate, the record reflects that after Plaintiff's MVA she sought treatment for her wrist and was prescribed Lortab by Dr. Gagliardi, from late September 2008 through approximately December 2008, but she sought no additional medical treatment until she presented to Dr. Sbarra at Sickbay in May 2009, with complaints related to her right hip. Although Plaintiff told Dr. Sbarra she was taking a variety of medications, including Vicodin, there are no treatment records from the time period of January 2009 through May 2009 and thus no documentation establishing that Plaintiff had been prescribed Vicodin or any other medication since

she last saw Dr. Gagliardi. A year then elapsed before Plaintiff presented to Dr. Williams for a VR evaluation in May 2010, and Dr. Williams did not prescribe any medications for Plaintiff. Thus, the ALJ did not err in relying on the fact that Plaintiff used only OTC pain medication.

Plaintiff's Weight Loss. Plaintiff's weight loss has little or no bearing on her credibility. While the weight loss may have improved Plaintiff's mobility or ability to function, such conclusions are not apparent from the record. It simply appears that, by losing weight, Plaintiff was attempting to follow her physicians' recommendations, improve her health, and/or become a candidate for hip replacement surgery.

Plaintiff's Receipt of VR Benefits and Plans to Attend College and Start a Business. The ALJ found that Plaintiff's future plans and her receipt of VR benefits are inconsistent with the characteristics of a typical, totally disabled person. Initially, the undersigned concludes that Plaintiff's future plans to attend college and start a business are essentially irrelevant to a determination of whether she was disabled for twelve continuous months during the time frame relevant to this appeal. The ALJ thus erred in considering such plans. His consideration of Plaintiff's receipt of VR benefits, however, may or may not have been in error. On one hand, Plaintiff's participation in VR may be viewed as a reflecting a desire to return to work, which is inconsistent with disability and indicates that she did not view her pain as disabling. *See* Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (claimant's statements that he was seeking work are inconsistent with disability). But on the other hand, the VR may have been geared toward future employment opportunities that would be available to Plaintiff after she lost additional weight and/or underwent hip replacement surgery. Indeed, the ALJ specifically noted that Plaintiff hopes to attend college and go into business after she obtains hip replacement surgery and that "she attends [VR] that will pay for her hip replacement surgery once she loses 60 more pounds" (tr. 22). If this is the case, the VR does not establish an ability to work during the time frame relevant to this appeal. Alternatively, if the VR was designed to "bridge the gap"—that is, to prepare Plaintiff for work she could perform while awaiting surgery—her participation is inconsistent with the ALJ's ultimate finding that she is not disabled because she can perform her past relevant work (it seems Plaintiff would not need VR to return to a job she knew

how to perform and was physically able to perform).  In short, the type, extent and purpose of Plaintiff's VR are not apparent from the record, and thus the undersigned cannot confidently conclude that the ALJ properly considered this factor.

Successful Right Wrist Surgery.  The ALJ essentially found that Plaintiff's wrist surgery was successful and that the record reflects only minimal, functional limitations in the right upper extremity.  These findings are supported by the record.  Plaintiff's treating physician for the wrist (Dr. Gagliardi) initially restricted her from heavier work, such as housekeeping, but within about a month or two of the wrist surgery Plaintiff was released to work with only some relatively minor lifting restrictions.  Moreover, as the ALJ found, Plaintiff sought no additional treatment for the wrist after her treatment with Dr. Gagliardi, which concluded in late 2008.  Finally, as the ALJ found, Plaintiff made no complaints regarding the right wrist when she was most recently examined by Dr. Williams in May 2010.

No Physician Has Opined That Plaintiff Is Unable to Work.  This reason is fully supported by the record and was properly considered by the ALJ.  *See* Singleton v. Astrue, 542 F. Supp. 2d 367, 378–79 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled"); Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 964–65 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability)).

Thus, in summary, three of the six reasons identified by the ALJ are substantially supported by the record:  Plaintiff's use of OTC medication, her successful wrist surgery, and the lack physician-imposed work restrictions.  The question thus becomes whether the ALJ's overall credibility finding may be upheld based only upon these reasons.  Of the three reasons, however, one relates entirely to Plaintiff's wrist condition, yet the issues at the heart of this appeal concern her hip and obesity conditions.   Thus, the question in actuality is whether the remaining two reasons—Plaintiff's use of OTC medication and the lack of physician-imposed restrictions—are alone enough to uphold the ALJ's decision to discredit Plaintiff's complaints of disabling hip pain

and disabling limitations due to the combined effect of her obesity and hip condition.  Having carefully considered the entire record and the arguments of the parties, the undersigned concludes that the ALJ's credibility finding cannot be upheld and that this case must be remanded for further administrative proceedings (as discussed more fully *infra*).

Plaintiff developed a serious hip condition that required surgical intervention in 1995, when she was only eleven years old.  Although the surgery was apparently successful initially, it was not successful permanently.  The record reflects that Plaintiff began experiencing hip pain in 2000, and x-rays obtained at that time revealed abnormalities beyond those attributable to the earlier surgery.  Plaintiff made similar but more severe complaints of hip pain in 2009 and 2010.  Additionally, her most recent hip x-rays from May 2010 document a significantly worsened hip condition (essentially an "end-stage" arthritic/obliterated hip joint, with significant narrowing of the superior joint space and spurring and sclerosis on both sides of the joint[11]) that could only be corrected by surgery, most likely a total hip replacement.  These x-ray results certainly appear to constitute "objective medical evidence confirming the severity of the alleged pain," so as to satisfy the Hand standard (in or about May 2010).  The ALJ, however, did not discuss the specific x-ray results in his opinion.  Rather, he reiterated only Dr. Williams' diagnoses (i.e., history of slipped capital femoral epiphysis requiring pin fixation in 1995, right hip DJD, and right lower extremity altered gait), Dr. Williams' statement that Plaintiff "is awfully young to consider total hip replacement," and Dr. Williams' prescription of a cane to "help [Plaintiff's] symptoms" (tr. 23).  Although the ALJ's statements are accurate as to Dr. Williams' diagnoses and comments, the ALJ appears to have minimized or overlooked the severity of Plaintiff's condition (by failing to discuss the x-ray results) and/or misinterpreted Dr. Williams' comments.  For example, even though Dr. Williams commented that Plaintiff is "awfully young" to undergo hip replacement surgery, he did not opine that such surgery was unnecessary or unheard of for a person of Plaintiff's age,[12] and it appears he commented on Plaintiff's young age

---

[11] Notably, the x-rays obtained in 2000 showed mild narrowing of the joint space and sclerosis only on the superior margin of the acetabulum (tr. 240).

[12] Indeed, Plaintiff was "awfully young" at age eleven when she underwent a prior, serious hip surgery, but her age did not render that surgery unnecessary.

merely out of compassion for her. Additionally, although Dr. Williams commented that a cane would help Plaintiff's symptoms, the ALJ failed to acknowledge the remainder of Dr. Williams' comment, namely, that the cane would help Plaintiff's symptoms only temporarily.

Moreover, the record establishes that Plaintiff's hip replacement surgery could not occur until she lost weight, which she was apparently doing at the time of her hearing before the ALJ. Although Plaintiff did not seek on ongoing medical care for her hip during the relevant time, it appears from the record that nothing else could be done for her hip except another surgery once she lost the necessary weight. Thus, Plaintiff would not have benefitted from consistent medical treatment (save for being prescribed stronger medications), and the best thing she could do was lose weight in order to prepare for surgery and/or attend VR in order to learn how to perform a job that better suited her physical abilities.

Furthermore, Plaintiff's second ground for relief in this appeal—that the ALJ erred in determining her RFC—relates to the first ground and provides additional justification for remanding this case for further administrative proceedings. In determining Plaintiff's RFC, and in discrediting Plaintiff's complaints to the extent they conflict with the RFC, the ALJ considered the opinions of Plaintiff's treating physicians and of the non-examining agency physician. Although the ALJ correctly found that Plaintiff's treating physicians imposed no work-related restrictions, a fair reading of Dr. Williams' report from May 2010 suggests that he believed Plaintiff was indeed functionally and vocationally limited due to her obesity and hip condition. Dr. Williams, however, was not asked to—and did not—assess Plaintiff's RFC, and his report contains no specific functional limitations other than Plaintiff's need to use a cane. Moreover, although the ALJ assigned "great weight" to the opinions of all of Plaintiff's treating physicians (*see* tr. 23–24), he did not identify the opinions to which he referred (opinions that presumably should support his credibility findings or RFC determination but which are not evident from the record).[13] Additionally, Dr. Sbarra—the only

---

[13] To the extent the ALJ fully credited Dr. Gagliardi's opinions, which included lifting restrictions with the right upper extremity, he did not err. It should be noted, however, that Dr. Gagliardi—who provided treatment for Plaintiff's wrist, not her hip—treated Plaintiff only during the first four months of the (approximate) twenty-eight month time frame relevant to this appeal. Thus, his opinions cannot be fairly construed as supporting a finding that Plaintiff was able to work through January 25, 2011, the end of the relevant time frame.

other physician who treated Plaintiff for her hip—did not assess Plaintiff's RFC. Indeed, the sole physician who specifically assessed Plaintiff's RFC is Dr. Louis, the non-examining agency physician, and the ALJ also assigned "great weight" his opinions (tr. 22–23). Dr. Louis' opinions, however, were rendered on September 29, 2009, and concern Plaintiff's condition as of that date (*see* tr. 324). His opinions thus have no bearing on Plaintiff's condition during the remainder the time frame relevant to this appeal (i.e., October 2009 through January 2011). Furthermore, as previously noted, Plaintiff's condition significantly worsened by May 2010, as evidenced by the x-rays obtained at that time, which worsening obviously could not have been considered by Dr. Louis. For these reasons, the ALJ erred in assigning great weight to Dr. Louis' opinions and, correspondingly, in relying upon them to determine Plaintiff's RFC.

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Foote, 67 F.3d at 1562 (stating that an insufficient credibility finding is "a ground for remand when credibility is critical to the outcome of the case") (emphasis added); Salter v. Astrue, No. 3:08cv189/RV/EMT (N.D. Fla. May 22, 2009) (doc. 15)) (same). A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes v. Sullivan, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence."); MacGregor, 786 F.2d at 1053 (where Commissioner does not discredit or make any findings regarding the weight of a treating physician's opinions, the opinions must be accepted as true).

In the instant case, it is far from clear that the cumulative effect of the evidence establishes disability without a doubt, much less disability for the entire period under review. The evidence

arguably suggests that Plaintiff could have returned to work in or about October 2008 based upon the opinions of Dr. Gagliardi, or even in September 2009 based upon the opinions of Dr. Louis, but the evidence does not substantially support a finding that Plaintiff could have continued working through January 25, 2011, the end of the time frame relevant to this appeal. Stated simply, the record reveals that the only physicians who specifically addressed Plaintiff's ability to work did so long before the end of the relevant period. Plaintiff did not undergo a consultative evaluation, and the physicians that treated her for her hip did not assess her RFC. Thus, the record lacks substantial support for the ALJ's RFC determination, and this case must be remanded for further administrative proceedings. Upon remand, the Commissioner should endeavor to supplement the record with information related to Plaintiff's VR, if possible, as the nature and extent of the VR certainly appear relevant to Plaintiff's claims. The Commissioner may also wish to recontact Dr. Williams or Dr. Sbarra and request a RFC assessment that addresses Plaintiff's condition during the relevant time. *See* 20 C.F.R. § 404.1512(e) (medical sources should be recontacted when the evidence received from that source is inadequate to determine whether the claimant is disabled). Finally, the Commissioner should address the conflicts in the evidence regarding Plaintiff's activities of daily living and, in general, further develop the record as necessary to ensure that the record is complete and adequate to make a decision.

## VI. CONCLUSION

For the foregoing reasons, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and should not be affirmed. *See* 42 U.S.C. § 405(g); Foote, 67 F.3d at 1556 (remanding for additional administrative proceedings).

Accordingly, it is respectfully **RECOMMENDED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to an Administrative Law Judge for further proceedings consistent with this Report and Rrecommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this 29th day of October 2012.

s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

      Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).